IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:14-CV-254-FL
NO. 5:14-CV-429-FL

DINH Q. TRAN,                                    )
                                                 )
                        Plaintiff,               )
                                                 )
        v.                                       )                ORDER
                                                 )
NOVO NORDISK PHARMACEUTICAL                      )
INDUSTRIES, INC.,                                )
                                                 )
                        Defendant.               )

This matter is before the court on defendant's motion for summary judgment, made pursuant

to Federal Rule of Civil Procedure 56. (DE 48). The issues raised have been briefed fully, and in

this posture are ripe for ruling. For the reasons that follow, defendant's motion for summary

judgment is granted in part and denied in part.

## STATEMENT OF THE CASE

Plaintiff brought this action pro se on April 30, 2014. (DE 1). Prior to that, plaintiff filed

a similar employment action against defendant in North Carolina state court,[1] which defendant

removed and the court consolidated. (DE 30). Following consolidation, plaintiff secured counsel

and filed an amended complaint on November 18, 2014, clarifying claims made pursuant to Title

VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000 et seq.; North Carolina public policy

---

[1] Plaintiff filed a complaint in the General Court of Justice, Superior Court Division, Harnett County, North
Carolina, on May 15, 2014. Pursuant to 28 U.S.C. §§ 1441, 1446, defendant removed the action to this court. Tran v.
Novo Nordisk Pharmaceutical Industries, Inc., No. 5:14-CV-429-FL. The court consolidated it with the present action
on November 7, 2014, directing all future filings henceforth to be made in the 5:14-CV-254-FL action. (DE 30).

embodied in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1 et seq.; the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240, et seq.,; and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 et seq. (DE 31). Plaintiff seeks compensatory damages, punitive damages, and costs of this action.

On November 25, 2014, defendant filed an answer and a counterclaim against plaintiff. (DE 33). Defendant asserts in its counterclaim that plaintiff breached a contract, where plaintiff has filed claims barred by a settlement agreement between the parties. In support of its counterclaim, defendant relies upon copies of a mediated settlement agreement (DE 33-1) (the "Mediated Settlement Agreement"), a final settlement agreement of workers' compensation claims (DE 33-2), and a document titled "Agreement for Global Employment Release." (DE 33-3) (the "Agreement for Global Release"). In addition, defendant attaches a letter from plaintiff's counsel referring to an enclosed, but partially executed, "Agreement of Final Settlement and Release" (DE 33-5), and a computer screenshot showing defendant's payment of mediator fees. (DE 33-4). Plaintiff filed an answer to defendant's counterclaim, denying most of the allegations and asserting a number of defenses. (DE 35).

On January 6, 2015, defendant filed a motion for judgment on the pleadings, arguing that the parties' settlement agreement barred plaintiff's claims. (DE 38). The court denied defendant's motion on April 28, 2015, finding that defendant relied upon documents not made part of the complaint and which therefore could not be considered without converting the motion to one for

summary judgment. (DE 44). The court noted also that some ambiguities exist with regard to certain terms in the settlement agreement documents.

On October 13, 2015, defendant filed the instant motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, relying upon several declarations. (DE 48, 50–56). In its supporting memorandum, defendant argues that the parties' settlement agreement bars plaintiff's claims, and that plaintiff's claims constitute a breach of contract; that plaintiff is unable to prove defendant's reason for terminating him is pretextual; that plaintiff does not have a qualified disability for purposes of the ADA; and that defendant did not fill plaintiff's position with a member of a non-protected class. (DE 49).

In support of its motion, defendant relies upon the settlement documents attached to the answer and counterclaim. In addition, defendant relies upon declarations from seven of its employees, including five of plaintiff's coworkers (DE 51, 53–56); Margaret Goodrich, a company nurse (DE 52); and Linda Hood, a human resources supervisor. (DE 50). In addition, defendant relies upon the following materials: a position statement that plaintiff's previous employer, Coty, Inc. ("Coty"), filed with the North Carolina Department of Labor in response to several employment discrimination claims plaintiff brought against Coty (DE 50-1); plaintiff's online employment application for his position with defendant (DE 50-2); and plaintiff's cover letter for his employment application. (DE 50-3).

On November 3, 2015, plaintiff filed a response in opposition to defendant's motion for summary judgment. (DE 57). Plaintiff argues that his impairments qualify as disabilities for purposes of the ADA, where his conditions are chronic, and where defendant regarded him as disabled; that defendant's reason for terminating him is pretextual, where plaintiff honestly

3

completed his employment application, and where declarations by defendant's employees contain speculation; that defendant's evidence of non-discriminatory employment practices is irrelevant where it includes employees not sufficiently similar to plaintiff; and that certain parts of the settlement agreement are unenforceable due to plaintiff's incapacity at the time. (DE 58).

In support of his response, plaintiff relies upon the following materials: his affidavit (DE 59); a form reporting one of plaintiff's injuries to the North Carolina Industrial Commission ("NCIC") (DE 59-2); a form from NCIC denying plaintiff's claim for workers' compensation (DE 59-7); an email plaintiff received from an investigator with the Equal Employment Opportunity Commission ("EEOC") (DE 59-3); copies of plaintiff's relevant time records and paychecks (DE 59-4); plaintiff's job description (DE 59-5); and a collection of plaintiff's medical records. (DE 60).

Defendant filed a reply on November 23, 2015 (DE 64), and attached the transcript of a recorded statement plaintiff gave to an agent of defendant's workers' compensation carrier. (DE 64-1). In its reply, defendant argues that plaintiff misstates facts and contradicts evidence in the record; that plaintiff concedes some of defendant's arguments by failing to oppose them in his response; that plaintiff's incapacity defense to enforcement of the settlement agreement is invalid where he failed to plead it as an affirmative defense; that plaintiff's impairments do not substantially limit any major life activities for purposes of the ADA; and that plaintiff still is unable to meet his burden of showing that defendant's cause for terminating him is pretextual.

## STATEMENT OF FACTS

Except as where otherwise noted below, the undisputed facts are as follows. Plaintiff was born in Vietnam and came to the United States in 1993. (DE 50-3, 2). Prior to his employment with defendant, plaintiff worked as a maintenance technician at Coty. (DE 50-1, 8–9). On

4

December 13, 2010, plaintiff submitted an online employment application for a position as a maintenance technician at defendant's facility in Clayton, North Carolina. (DE 50-2, 2). In his application, plaintiff represented that he left Coty to "open [a] new business." (DE 50-2, 5). Defendant hired plaintiff on January 10, 2011. (DE 50 ¶ 10).

On September 30, 2011, plaintiff suffered an injury at work, reported the injury to his supervisors, received medical care, and was permitted three days leave from work as recommended by his physician. (DE 50 ¶ 11). After the three-day leave, plaintiff returned to work without restrictions. (DE 50 ¶ 11; DE 33-2, 8). Defendant reported the accident to its workers' compensation carrier, but the carrier closed the claim where plaintiff did not explain to the carrier his reason for declining to follow a recommended treatment plan. (DE 50 ¶ 13). Nonetheless, the carrier paid plaintiff for temporary total disability for the three-day leave, as well as for his medical expenses. (See id. ¶ 25; DE 33-2, 8).

On Wednesday, August 14, 2013, plaintiff suffered a second injury at work. (DE 50 ¶ 24(a); see 59 ¶ 5). While moving a pallet, plaintiff injured his back.[2] (DE 59-2 ¶¶ 12–13; DE 59 ¶ 5). Plaintiff subsequently left work midday and visited the emergency room of a local hospital seeking treatment for his back pain. (DE 50 ¶ 14). Plaintiff was diagnosed with a back strain, prescribed pain medication, and advised to remain out of work for three days. (DE 33-2, 5; DE 60, 8–13). Sometime thereafter, he filed a claim for workers' compensation related to his second injury. (See DE 50 ¶ 21).

---

[2] It is unclear from the record whether plaintiff also fell while moving the pallet. For example, Hood reports that plaintiff told her that "he fell when he was moving a pallet" (DE 50 ¶ 24.a), while plaintiff says that putting down a pallet was the sole cause of his injury. (DE 59 ¶ 5).

For approximately two weeks, plaintiff failed to appear as scheduled for numerous shifts, and visited a number of different doctors. (DE 33-2; DE 50 ¶¶ 15–16; DE 60, 1–3). Plaintiff returned to work on Friday, August 23, and complained to his supervisors that he still was experiencing back pain. (DE 50 ¶ 20). In light of plaintiff's complaint, he was reassigned to flip trays, which involves lifting and walking while moving pallets and trays. (DE 50 ¶ 20). When plaintiff reported that even this work caused him pain, his supervisors dismissed him from the rest of the shift. (DE 50 ¶ 20). At this point, defendant conducted a series of interviews of those coworkers present at the time of plaintiff's reported injury. (DE 51, 53–56).

Plaintiff reported to work as scheduled on Thursday, August 29, but after approximately three hours he met with defendant's human resources supervisor, Linda Hood, to complain of continued pain. (DE 50 ¶ 24). At the meeting, Hood asked plaintiff to provide additional details regarding his August 14 injury. (DE 50 ¶ 24). He said that two coworkers were in the room when he injured himself, and although they did not see or hear the incident, plaintiff told them that he was in pain and going to see a nurse. (DE 50 ¶ 24.a; DE 59 ¶ 15).

Next, Hood asked plaintiff if he had ever experienced a work-related injury with another company. (DE 50 ¶ 24.b). Plaintiff said that he had not. (DE 50 ¶ 24.b). Hood informed plaintiff that, according to a background check completed by the workers' compensation carrier, he had made three previous work-related claims. (DE 50 ¶ 24.b). At that point, plaintiff said that he had fallen while at work with a previous employer and broken a tooth. (DE 50 ¶ 24.b). Plaintiff denied making any other workers' compensation claims. (DE 50 ¶ 24.b).

Hood then asked plaintiff why he had left Coty, his previous employer. (DE 50 ¶ 24.c). Plaintiff said that he left Coty to open a new business. (DE 50 ¶ 24.c). When Hood informed him

that a statement from Coty showed it had terminated plaintiff for cause, he insisted that he had left voluntarily, and then contended that the termination was not his fault.  (DE 50 ¶ 24.c, d).  First, he said that he had been terminated for reporting a discriminatory action he observed involving two of his coworkers.  (DE 50 ¶ 24.d).  Later in the meeting, plaintiff suggested that Coty had falsely accused him of not wearing required safety glasses.  (DE 50 ¶ 24.e).  Asked why he did not disclose and explain the termination on his employment application, he repeated that he was not terminated for cause because he opened a business after leaving Coty.  (DE 50 ¶ 24.e).  At that point, Hood concluded the meeting and dismissed plaintiff from the remainder of his shift.  (DE 50 ¶ 24.f; DE 59 ¶ 23).

On September 2, 2013, plaintiff returned to work as scheduled and without restriction.  (DE 50 ¶ 26).  He continued to work until defendant terminated his employment on September 17.  (DE 50 ¶¶ 26–27).  The decision to terminate plaintiff followed the conclusion of defendant's investigation into his employment application and his reports regarding the August 14 injury.  (DE 50 ¶ 27).  Based upon the results of the investigation, Hood and other supervisors determined that plaintiff "exhibited a continuing pattern of dishonesty starting with falsifying his application and continuing throughout the investigation into his alleged accident. . . . In light of the results of the investigation, [defendant] felt that it could no longer trust [plaintiff]."  (DE 50 ¶ 27).  Following plaintiff's termination, and in response to a reduction in production demands, defendant eliminated plaintiff's former position of maintenance technician, and reassigned the members of plaintiff's former team to other production lines.  (DE 50 ¶ 30).

On September 26, 2013, following his termination, plaintiff filed with the EEOC a charge of discrimination against defendant, wherein he alleged discrimination based upon race, national

origin, and disability. (DE 19-4). In addition, on November 4, 2013, plaintiff filed with the North Carolina Department of Labor an employment discrimination complaint, alleging in relevant part that defendant terminated him for filing a workers' compensation claim. (DE 49-1, 3).

The parties, both represented by counsel, participated in a mediated settlement conference on March 17, 2014, at which they signed two documents: the Mediated Settlement Agreement and the Agreement for Global Release. (DE 33-1, 33-3). Each document references a corresponding document forecasted to be signed in the future. (See DE 33-1, 33-3). For example, the Mediated Settlement Agreement provides in part that the parties will enter into a "standard Compromise Settlement Agreement which complies with N.C.G.S. 97-17." (DE 33-1, 2). On May 15, 2014, the parties signed that forecasted agreement, which encompasses any claim under the North Carolina Workers' Compensation Act. (DE 33-1).

The second document signed at the March 17 meeting, the Agreement for Global Release, provides that in exchange for defendant's payment of plaintiff's share of the mediation fee, plaintiff "hereby agrees to execute a mutually acceptable Release of All Claims to be prepared by [defendant] or [defendant]'s representative." (DE 33-3). Pursuant to that arrangement, defendant paid plaintiff's share of the mediation fee (DE 33-4), and prepared a document entitled Confidential Settlement Agreement and General Release ("General Release"), which contemplates plaintiff's release of all claims against defendant. (DE 27-5, 5–8). In relevant part, the draft General Release reads:

> To the greatest extent permitted by law, I[, plaintiff] release [defendant] . . . from all known or unknown claims (including attorney's fees) that I presently may have against [defendant or its agents] through the time I sign this Agreement. The claims I am releasing include, for example, claims arising out of my employment with or resignation from, [defendant] under Title VII of the Civil Rights Act of 1964, and any other federal, state, or local common law, statute, regulation, or law for any type of discrimination, harassment or retaliation for protected activity EXCEPT for the Age Discrimination in Employment Act of 1967, as amended.

8

(DE 27-5, 5 ¶ 5(a)). Defendant circulated the document to plaintiff through his counsel. (See DE 33-5). However, plaintiff declined to sign the General Release, suggested no edits in response, and subsequently filed against defendant the instant employment-related discrimination claims. (DE 33-5).

## COURT'S DISCUSSION

A.    Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge." Id. at 255. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id.; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be

9

drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.      Analysis

    1.      Settlement Agreement

Defendant argues that it is entitled to summary judgment on its counterclaim and in defense of plaintiff's claim, on the basis that the parties signed a set of enforceable settlement agreements in which plaintiff released his right to bring claims against defendant for discriminatory termination. Settlement agreements are valid and enforceable contracts where the parties' "minds . . . meet as to all the terms," see Chappell v. Roth, 353 N.C. 690, 692 (2001), and where the material terms are "definite within themselves or capable of being made definite." Brawley v. Brawley, 87 N.C. App. 545, 549 (1987). If the parties leave any of the material terms unsettled, they do not have a contract. Chappell, 353 N.C. at 692.

10

In Chappell, the parties signed a settlement agreement containing the following terms and conditions: "Defendant will pay $20,000 within [two] weeks of date of settlement in exchange for voluntary dismissal (with prejudice) and full and complete release, mutually agreeable to both parties." Id. at 691. However, when the defendants presented the plaintiff with a proposed release, she refused to sign it. Id. The North Carolina Supreme Court held that because the parties had intended mutual release to serve as consideration for the settlement agreement and because the parties never agreed on the terms of any such mutual release, the settlement agreement was unenforceable. Id. at 692. The court reasoned that the release was a material term of the settlement agreement upon which the parties never reached a meeting of the minds. Id. at 693. Because the parties failed to agree to a material term of the settlement agreement, the entire agreement was of no effect. Id.

In In re Rodgers, No. 5:13-CV-764-FL, 2015 WL 3994882 (E.D.N.C. July 1, 2015) vacated on other grounds, 2016 WL 917317 (Mar. 8, 2016), this court considered the enforceability of a purported settlement agreement under comparable circumstances. There, the plaintiff agreed to convey certain real property to the defendants in exchange for all parties to dismiss their claims and execute a mutual release. Id. at *4–5. Following the agreement, the plaintiff refused to convey the property or to dismiss his claims. Id. at *5. The court found that the parties never executed an agreement defining the precise terms and limits of their "mutual release," and that the terms of their original agreement did not provide a mechanism by which the court could infer the terms and limits of any such release. Id. at *8. "Without a separate agreement, or any contrary intention evidenced in the terms of the [original agreement], the [parties'] actions evidence their intent that the [original

agreement] merely serve as a preliminary agreement to agree, which the court cannot and will not enforce." Id.

The Fourth Circuit Court of Appeals construed Chappell in Campbell v. Adkisson, Sherbert & Associates, 546 Fed. App'x 146 (4th Cir. 2013). Campbell involved a disputed settlement agreement between a bank, Prospect, and an accounting firm, Adkisson Sherbert & Associates ("ASA"). Id. at 148–49. After a long period of negotiation, the two parties reached an oral agreement as to five essential terms:

> 1) ASA would pay Prospect a sum certain;
> 2) Prospect would file a dismissal with prejudice of all claims against ASA;
> 3) Prospect would release ASA from any and all claims it might have against ASA;
> 4) The terms of the settlement would be confidential;
> 5) The parties would bear their own costs.

Id. at 149. After exchanging at least six drafts over the course of several months, disputes surrounding choice-of-law and venue provisions frustrated the parties' efforts to reach a final agreement. Id. at 151. Prior to the final breakdown in negotiations, and preceding their oral agreement, the parties had a minor disagreement regarding the release provision. Id. at 153 ("[A]fter a dispute arose . . . as to whether [a debtor of Prospect] was included in the release, ASA ultimately accepted the release of [the debtor] after expressing dissatisfaction with it only once."). The court found the oral agreement binding, including the release provision. Id. at 153–54. The court acknowledged that the release provision was not particularly defined, but nonetheless found that it was not a material term precluding enforceability. Id.

The Campbell court contrasted the facts before it from those in Chappell on the basis that "the parties here did not condition their settlement on the negotiation of a specific release provision," whereas in Chappell, "[b]ecause the negotiation and agreement on a release was included in the

12

terms, the court determined that the parties never had a meeting of the minds without that release provision." Id. at 154 (internal quotations omitted). In particular, the Fourth Circuit Court of Appeals found that the language of the negotiated agreement in Chappell requiring "a full and complete release, mutually agreeable to both parties," caused the Chappell court to find the agreement unenforceable. Id. (quotations omitted).

The facts in Chappell resemble those at issue here. In particular, the language of the settlement agreement in Chappell directly parallels the language of the parties' Agreement for Global Release. The agreement in Chappell read: "Defendant will pay $20,000 within [two] weeks of date of settlement in exchange for voluntary dismissal (with prejudice) and full and complete release, mutually agreeable to both parties." 353 N.C. at 691 (emphasis added). By comparison, the parties' Agreement for Global Release reads:

> The above listed parties agree that in exchange for the consideration listed below, [plaintiff] hereby agrees to execute a mutually acceptable Release of All Claims to be prepared by [defendant] . . . . In exchange for this agreement, [plaintiff] accepts the following consideration: Payment of [plaintiff']'s share of the mediation fee.

(DE 33-3) (emphasis added). In both agreements, the parties' conditioned their settlement upon undefined releases required to be mutually agreeable. Contra Campbell, 546 Fed. App'x at 154. Accordingly, the decision in Chappell requires finding unenforceable the Agreement for Global Release, where the parties intended mutual release to serve as consideration for the settlement agreement, and where the parties never agreed on the terms of any such mutual release. See Chappell, 353 N.C. at 692–93.

By way of contrast, the parties in Campbell were much closer to a meeting of the minds than the parties here. 546 Fed. App'x 146. Sophisticated parties in Campbell exchanged upwards of six drafts of one agreement over several months, id. at 151, whereas plaintiff and defendant exchanged

13

a final draft of the Agreement for Global Release during one meeting, and promptly reached an impasse two months later. (DE 27-5, 2, 4). The degree of disagreement also differs, where plaintiff refused to sign the entirety of the forecasted General Release, and suggested no edits in response; the parties in Campbell resolved a relatively minor dispute involving the release with one party's expression of dissatisfaction and subsequent acquiescence. 546 Fed. App'x at 153.

Ambiguities in the proposed General Release underscore the undefined terms of settlement in the Agreement for Global Release. Material terms of the General Release are vague and susceptible to multiple interpretations, where it is proposed that plaintiff "release the [defendant] . . . from all known or unknown claims," but then promptly adds a qualifier: "EXCEPT for the Age Discrimination in Employment Act of 1967." (DE 27-5). The General Release excludes specific claims under certain statutes and allows certain claims under others, thereby belying its "general" nature and adding ambiguity to the terms of a proposed settlement. Where the parties intended a release of claims to serve as consideration for a settlement agreement, and where the material terms of that agreement are not defined, the proposed General Release adds additional evidence that the parties merely agreed to agree on settlement terms that they failed to define. See Chappell, 353 N.C. at 692.

In sum, for the reasons set forth above, the court finds the Agreement for Global Release to be a mere agreement-to-agree, and therefore unenforceable. See Chappell, 353 N.C. at 693. The terms of the forecasted, but unsigned, General Agreement are not binding upon the parties. Therefore, defendant's motion for summary judgment on the issue of plaintiff's liability under defendant's counterclaim based upon the parties' settlement agreement is denied.

14

In the alternative, defendant requests an evidentiary hearing on the issue of the parties' settlement agreement. However, where the parties failed to agree on the material terms of the General Release, and where the court enforces no settlement agreement, no evidentiary hearing is required. <u>See</u> <u>Hensley v. Alcon Laboratories, Inc.</u>, 277 F.3d 535, 541 (4th Cir. 2002) (requiring evidentiary hearings where factual disputes occur surrounding the existence of an agreement enforced by the court). Accordingly, defendant's request for an evidentiary hearing is denied.

     2.     Title VII

          i.     Prima Facie Case

Title VII makes it unlawful for an employer to refuse to hire, discharge, or otherwise discriminate against any individual based on the individual's race, color, or religion. 42 U.S.C. § 2000e-2. To establish a prima facie case, plaintiff must show 1) that he is a member of a protected class; 2) that he suffered from an adverse employment action; 3) that when defendant took such action, he was meeting defendant's legitimate expectations in his performance; and 4) and that the position was filled by a similarly qualified applicant outside the protected class. <u>King v. Rumsfeld</u>, 328 F.3d 145, 149 (4th Cir. 2003). Plaintiff may prove discrimination either with direct evidence of such discrimination, or through the indirect method of proof established under the framework of <u>McDonnel Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny. <u>See</u> <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 278–79 (4th Cir. 2000).

The parties dispute whether plaintiff satisfied the fourth element of his Title VII claim. However, plaintiff provides no evidence, aside from bare allegations, that defendant filled the position of maintenance technician or attempted to do so after his discharge. <u>See</u> <u>Bryant v. Bell Atl. Maryland.</u>, 288 F.3d 124, 134–35 (4th Cir. 2002) (finding unsupported speculation insufficient to

defeat summary judgment). In addition, plaintiff fails to respond to defendant's argument that it has not filled plaintiff's former position. See Feldman v. Law Enforcement Assocs. Corp., 955 F. Supp. 2d 528, 536 (E.D.N.C. 2013) (finding failure to respond to argument in brief opposing motion for summary judgment implicitly concedes the argument). Nor does plaintiff dispute evidence that, in response to a reduction in production demands, defendant eliminated plaintiff's position following his termination and reassigned all members of plaintiff's team to other production lines. (DE 50 ¶ 30) Accordingly, the court finds that plaintiff's claim under Title VII must fail as a matter of law where the fourth element of the prima facie case is not satisfied.

ii.     Reason for Termination

As an alternative basis for resolving plaintiff's Title VII claim, the parties dispute whether defendant states legitimate reasons for terminating plaintiff, or whether its reasons are mere pretext for discrimination. Under the Douglas burden-shifting framework, if a plaintiff satisfies all four elements of the prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Hawkins, 203 F.3d at 278. If a defendant makes this showing, then the burden shifts to require that the plaintiff prove that the defendant's proffered reason is merely a pretext for discrimination. Id. at 278–79.

Courts utilize the "honest belief rule" to evaluate employers' responses to claims of employment discrimination, under which "[an] employee must present evidence reasonably calling into question the honesty of his employer's belief." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citing Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 411 (7th Cir. 1997)). See Sharif v. United Airlines, Inc., No. 1:14-CV-1294, 2015 WL 4042173, at *6 (E.D. Va. July 1, 2015); see also EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001)

(holding that plaintiff had put forth sufficient evidence of pretext where the record did not support the employer's contention that the employee's supervisor "honestly believed" that the plaintiff had been investigated for sexual harassment).

To find a genuine dispute of material fact exists regarding whether an apparently legitimate, non-discriminatory reason actually is pretext for discrimination, "it is not enough to <u>dis</u> believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147 (2000). Proof that "the employer's proffered reason is unpersuasive . . . does not necessarily establish that the plaintiff's proffered reason is correct." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 524 (1993). For example, the "plaintiff must produce evidence that goes beyond that which was necessary to make a prima facie showing by pointing out specific, non-speculative facts which discredit the defendant's non-retaliatory motive." <u>Nguyen v. Austin Quality Foods, Inc.</u>, 974 F. Supp. 2d 879, 884 (E.D.N.C. 2013).

Employers are entitled some discretion in making employment decisions. <u>DeJarnette</u>, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.") (quotations omitted). "When an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." <u>Id.</u> (internal quotations omitted). In evaluating opinions regarding termination, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." <u>Id.</u>

Dishonesty may be a legitimate, non-discriminatory cause for termination.  See Shipman v. United Parcel Service, Inc., 581 Fed. App'x 185, 187 (4th Cir. 2014); Sweatt v. Union Pacific R.R. Co., 796 F.3d 701, 710) (7th Cir. 2015) ("dishonesty during the [hiring] interview"); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 41–42 (1st Cir. 2001) ("[plaintiff] responded dishonestly when repeatedly confronted with the documented fact"); Sharif, 2015 WL 4042173, at *6–7.  In light of an employer's discretion, see DeJarnette, 133 F.3d at 299, where a plaintiff points to evidence that investigation of his dishonesty was not entirely accurate or complete, the issue is not the factual accuracy of the investigation but whether the employer reasonably perceived that it was accurate. See Sharif, 2015 WL 4042173, at *7; see also Tesh v. U.S. Postal Service, 349 F.3d 1270, 1274 (10th Cir. 2003).

Here, defendant asserts it terminated plaintiff because it believed that he acted dishonestly in completing his employment application and in responding to an investigation by defendant.  (See DE 49, 20).  Defendant first became concerned with plaintiff's degree of honesty during its investigation of plaintiff's reported second injury.  (DE 50 ¶ 24.a).  On August 29, 2013, at a meeting between plaintiff and defendant's representatives ("August 29 meeting"), Hood asked him to describe the incident that caused his injury.  (DE 50 ¶ 24, 24.a).  She reports, "[plaintiff] said he fell when he was moving a pallet," and that he told two coworkers he had injured himself and was going to visit the nurse for treatment of his back.  (DE 50 ¶ 24.a).  However, in interviews of both coworkers, each denied that plaintiff told her that he fallen and injured his back.  Obvious contradictions between plaintiff's report of the events and those of several coworkers support defendant's concern regarding plaintiff's honesty.  See Sharif, 2015 WL 4042173, at *8.

Defendant's investigation revealed also that plaintiff provided an incomplete response to a question on his employment application. Plaintiff had represented that he left his previous employer, Coty, to begin a new business. However, Coty informed defendant that it terminated plaintiff for cause, specifically for violation of company safety rules, abusive behavior towards coworkers, and dishonest conduct. (DE 50-1; 50 ¶ 3). At the August 29 meeting, Hood asked plaintiff to explain why he left Coty. (DE 50 ¶ 24.c). First, plaintiff said he had left to start a new business. (Id.). When confronted with the conflicting account from Coty, he insisted again that he had left to start his own business. (Id.) Asked a third time, plaintiff said that the termination was not his fault, and that Coty terminated him for witnessing an act of racial discrimination between his coworkers. (DE 50 ¶ 24.d).

When Hood asked why plaintiff had not disclosed and explained that on his application, plaintiff repeated his response about leaving to open a business. (DE 50 ¶ 24.e). After several more questions, plaintiff refused to agree that he was terminated; instead, he said that Coty had invented a reason to terminate him for failure to wear required safety glasses. (Id.). Such numerous discrepancies in plaintiff's responses strongly support defendant's reasonable belief that plaintiff conducted himself dishonestly during the August 29 meeting. See DeJarnette, 133 F.3d at 299; Sharif, 2015 WL 4042173, at *7 (finding legitimate an employee's belief in dishonesty based upon an employee's "fraudulent statements [of] alleged use of FMLA leave," and "inconsistent answers during the [resulting] meeting").

At the same meeting, Hood asked plaintiff if he ever had experienced another work-related injury with another company. (DE 50 ¶ 24.b). Plaintiff responded that he had not. (Id.). Hood explained that a background check completed by defendant's workers' compensation carrier showed

that plaintiff had made three previous claims for work-related injuries with companies beside defendant. (Id.). Plaintiff then recalled that he had fallen at a previous employer and broken a tooth while at work. (Id.). Apart from that claim, and plaintiff's first injury claim with defendant, he denied making any other workers' compensation claims. (Id.). Plaintiff's denial in the face of factual documentation buttresses defendant's reasonable belief in plaintiff's dishonest conduct, see Straughn, 250 F.3d at 41–42, as does the inconsistency of those responses. See DeJarnette, 133 F.3d at 299; Sharif, 2015 WL 4042173, at *7.

Approximately two weeks after the August 29 meeting, defendant terminated plaintiff, citing concerns that he falsified his employment application and exhibited a pattern of dishonesty during investigation of his reported second injury. (DE 50 ¶ 27). Where dishonesty is a non-discriminatory cause for termination, Shipman, 581 Fed. App'x at 187, and where defendant possessed a reasonable belief in plaintiff's dishonesty, see DeJarnette, 133 F.3d at 299, defendant carries its burden of showing a legitimate, non-discriminatory reason for terminating plaintiff.

Accordingly, the burden shifts to plaintiff to prove that dishonesty and falsification of records were merely pretextual reasons. See Hawkins, 203 F.3d at 278. First, plaintiff disputes the quality and accuracy of some details from defendant's interviews of his coworkers about his reported injury. He points out that many of the coworkers with whom he spoke were busy; for example, he observed that one coworker recorded no notes of their conversation. Such arguments miss the mark, however, where the relevant perspective on the investigation is that of defendant, not plaintiff. See DeJarnette, 133 F.3d at 299. Even if defendant's investigation was not perfect, plaintiff's claimed error does not undermine the reasonableness of the investigation and defendant's honest belief in its results. See

id. Disputes over such nonmaterial facts do not defeat summary judgment. See Anderson, 477 U.S. at 247–48.

Next, plaintiff disputes defendant's treatment of his employment application. Plaintiff argues that he did not falsify his employment application because, in fact, he opened a business with his wife some time after leaving Coty. This argument is misplaced; it asserts plaintiff's perspective on the completeness of his application, where the relevant perspective is defendant's. See DeJarnette, 133 F.3d at 299. Nor does this argument support an explanation of intentional discrimination. See Reeves, 530 U.S. at 147. Instead, it disputes the results of defendant's investigation, which need only to be reasonably believed, not factually exact. See DeJarnette, 133 F.3d at 299.

Plaintiff's contention that the online application form was too small to permit a longer response is belied by the fact that, when given an opportunity to explain at the August 29 meeting his departure from Coty, he repeated three times his answer from the online application form. (DE 50 ¶ 24.c, d, e). Moreover, his attack on the construction of the application form is misplaced for the same reasons as his argument that he did not falsify his response, namely that the perspective is his own, see DeJarnette, 133 F.3d at 299, and it does not support an explanation of intentional discrimination against him. See Reeves, 530 U.S. at 147.

Lastly, plaintiff argues that the cause for his termination from Coty is irrelevant, and therefore defendant should not consider its omission from his application. However, defendant does not assert that it terminated plaintiff on the basis of his termination from Coty, but instead that it terminated him for dishonesty surrounding disclosure of his departure from Coty, which is permissible and relevant. See Sharif, 2015 WL 4042173, at *7. As a result, plaintiff fails to carry

his burden to show that plaintiff's reasons for terminating him were pretextual. See Hawkins, 203 F.3d at 278.

In sum, defendant satisfies its burden showing a legitimate, non-discriminatory reason for terminating plaintiff, see DeJarnette, 133 F.3d at 299, and plaintiff fails to show there exists a genuine issue of material fact that defendant's reason is pretextual. See Hawkins, 203 F.3d at 278. Accordingly, plaintiff's failure to carry his burden under the Douglas framework provides an additional basis for granting defendant's motion for summary judgment on plaintiff's claim under Title VII.

3.      North Carolina Equal Employment Practices Act ("NCEEPA")

Plaintiff contends that defendant's same actions violating Title VII violate also the public policy of North Carolina as set forth in NCEEPA. NCEEPA states, in relevant part, "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race." N.C. Gen. Stat. § 143-422.2. Although this statute does not provide a private cause of action, Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000), it does support a common law claim for wrongful discharge in violation of public policy. McLean v. Patten Cmtys., Inc., 332 F.3d 174, 720–21 (4th Cir. 2003). "Given the similar language and underlying policy of § 143-422.2 and Title VII, 42 U.S.C. § 2000e et seq., the North Carolina Supreme Court explicitly has adopted the Title VII evidentiary standards in evaluating a state claim under § 143-422.2." Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995). Thus, a claim for wrongful discharge in violation of the public policy set forth in the NCEEPA rises and falls with its counterpart under Title VII. For this reason, plaintiff's claim of wrongful discharge in violation of the NCEEPA fails as a matter of law. See

<u>Moss v. Steele Rubber Products, Inc.</u>, 2010 WL 1380364, *7 (W.D.N.C. 2010). Accordingly, the court grants defendant's motion for summary judgment with respect to plaintiff's NCEEPA claim.

    4.        Americans with Disabilities Act ("ADA")

Plaintiff asserts that defendant violated the ADA, by failing to accommodate his disabilities, and by terminating him as a result of his request for accommodation. Plaintiff's first argument implicates the proper scope of his claim in relationship to his original EEOC charge, and his second argument involves the analysis of pretext above.

An EEOC charge determines the scope of a plaintiff's right to bring a subsequent action in federal court. <u>See Bryant</u>, 288 F.3d at 132–33. "[O]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." <u>Evans v. Techs. Applications & Servs. Co.</u>, 80 F.3d 954, 963 (4th Cir. 1996).

The Fourth Circuit takes a narrow approach to determining if claims are "reasonably related" to or "developed by reasonable investigation of" the original complaint. <u>Evans</u>, 80 F.3d at 963. The Fourth Circuit has held that a plaintiff may not expand an adverse employment action beyond the allegations stated in the original EEOC charge. <u>Chako v. Patuxent Institution</u>, 429 F.3d 505, 509 (4th Cir. 2005). For example, in <u>Tran v. Coty Inc.</u>, No. 5:10-CV-431-H, 2011 WL 6325970, at *1 (E.D.N.C. Dec. 13, 2011), <u>aff'd</u> 472 Fed. App'x 158 (4th Cir. May 1, 2012), the court refused to consider this plaintiff's claims of discrimination where, on his administrative charge with the EEOC, he claimed only retaliation.

Here, plaintiff alleges in his EEOC charge that defendant terminated him a manner different from his non-Asian coworkers. Specifically, he alleges: "After being injured on the job and filing

several workmen's compensation claims against the Respondent, I was informed I was being discharged because I allegedly entered false information on my 2010 job application." (DE 19-4). As relevant to his ADA claim, plaintiff does not allege in his EEOC charge that defendant failed to accommodate his disabilities, but rather cites discriminatory termination based upon "being injured on the job." (Id.). Accordingly, plaintiff may not expand his ADA claim to include allegations, such as a failure to accommodate, which are beyond those stated in his original EEOC charge. See Chako, 429 F.3d at 509.

Moreover, plaintiff's own memorandum delineates the questions presented to include only those issues raised in his EEOC charge, with no mention of a failure to accommodate. (See DE 58, 5). Even where defendant raises the argument that certain of plaintiff's allegations exceed those in his EEOC charge, plaintiff declines the address the issue, thereby conceding it. See Feldman, 955 F. Supp. 2d at 536. Accordingly, plaintiff's argument that defendant violated the ADA by failing to accommodate his disabilities must fail.

The remainder of plaintiff's ADA claim, namely that defendant discriminated in terminating him based on his disability, implicates the burden-shifting framework outlined in Douglas, which applies to claims made pursuant to the ADA. Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57–58 (4th Cir. 1995). While the parties dispute whether plaintiff is a "qualified individual" for purposes of the ADA, that issue is moot where the court finds that he remains unable to carry the burden of showing there exists a genuine issue of material fact that defendant's reasons for terminating him were pretextual. See DeJarnette, 133 F.3d at 299. Accordingly, defendant's motion for summary judgment must be granted with regard to plaintiff's ADA claim.

5.      Retaliatory Employment Discrimination Act ("REDA")

REDA prohibits discrimination or retaliation against an employee for, among other things, filing a workers' compensation claim.  N.C. Gen. Stat. § 95-241(a)(1).  If a plaintiff establishes a prima facie case of retaliatory termination, the burden shifts to the defendant "to show that it would have taken the same unfavorable action in the absence of the protected activity of the employee." Nguyen, 974 F. Supp. 2d at 882–83.  "Once defendant meets its burden, plaintiff must demonstrate that the proffered non-discriminatory reason was actually pretext for discrimination."  Id. at 883. In particular, "plaintiff must produce evidence that goes beyond that which was necessary to make a prima facie showing by pointing out specific, non-speculative facts which discredit the defendant's non-retaliatory motive."  Id. at 884–85 (internal quotations omitted).

Plaintiff's REDA complaint to the North Carolina Department of Labor alleges that defendant took employment action against him "[b]ecause I filed a worker's [sic] compensation claim after receiving many job preformance [sic] awards I was fired."  (DE 49-1 ¶ 12).  Defendant concedes plaintiff's prima facie case, instead resting on its argument, recognized above, that it terminated plaintiff for legitimate, non-discriminatory reasons.  For additional support of that argument as it pertains to plaintiff's REDA claim, defendant provides evidence of 19 employees who claimed workers' compensation for injuries sustained while at work.  The records show Caucasian and African American employees of American national origin, but does not include information on whether the employees are disabled for purposes of the ADA.  (DE 50 ¶ 12). Defendant returned all 19 employees to work following their injuries, with or without accommodation, after they filed workers' compensation claims.  (Id.).

25

Plaintiff argues that such evidence supports his claim for retaliatory discrimination under REDA on a statistical basis, where the evidence does not include the employees' disabilities, and where all of the employees are of American national origin. However, plaintiff's argument veers into issues beyond his REDA claim, which is grounded in his allegation of termination due to filing a workers' compensation claim. (See DE 49-1 ¶ 12). Arguments based on disability and national origin are addressed in the context of plaintiff's claims under Title VII and the ADA for discriminatory termination. Plaintiff's criticism of defendant's evidence fails to specify any non-speculative facts that would show he was terminated due to his workers' compensation claim instead of defendant's proffered reasons of dishonesty and falsification of his application. See Nguyen, 974 F. Supp. 2d at 884–85. Instead, plaintiff leaves undisputed the evidence relevant to his claim under REDA, namely that defendant shows it returned to work numerous other employees who filed workers' compensation claims. (DE 50 ¶ 12).

Accordingly, plaintiff is unable to carry his burden of showing that dishonesty and falsification of records were merely pretextual reasons for his termination. See Hawkins, 203 F.3d at 278. Therefore, defendant's motion for summary judgment on plaintiff's REDA claim is granted.

## CONCLUSION

Based on the foregoing discussion, the court GRANTS IN PART and DENIES IN PART defendant's motion for summary judgment, made pursuant to Federal Rule of Civil Procedure 56. In particular, defendant's motion for summary judgment on plaintiff's claims under Title VII, NCEEPA, the ADA, and REDA is GRANTED. However, defendant's motion for summary judgment on the issue of plaintiff's liability under defendant's counterclaim based upon the parties' settlement agreement is DENIED. Because a counterclaim generally continues despite summary

judgment on plaintiff's claims, the court DIRECTS defendant to show cause why the counterclaim should not be denied as a matter of law in light of the discussion herein, within **14 days** of entry of this order.

SO ORDERED, this the 18th day of April, 2016.


LOUISE W. FLANAGAN
United States District Judge